# In the United States Court of Federal Claims

### No. 15-20T
### (Filed: August 16, 2017)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
\*
**GREGORY ALAN HANN AND**                 \*
**BARBARA CHILDS HANN,**                   \*      **Tax Refund Suit; 26 U.S.C. § 83; 26 C.F.R.**
                                           \*      **§ 1.83-7; Nonqualified Stock Options;**
                   **Plaintiffs,**         \*      **Cashless Option Exercise; Initial Public**
                                           \*      **Offering (IPO); Underwriters'**
            **v.**                         \*      **Commission; Capital Loss.**
                                           \*
**THE UNITED STATES,**                     \*
                                           \*
                   **Defendant.**          \*
                                           \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Gregory Hann and Barbara Childs Hann, Virginia Beach, Virginia, pro se.

David A. Hubbert, David I. Pincus, Mary M. Abate, and Jason S. Selmont, U.S. Department of Justice, Tax Division, Court of Federal Claims Section, P.O. Box 26 Ben Franklin Station, Washington, D.C., 20044, for Defendant.

_____

## OPINION AND ORDER
_____

**WILLIAMS,** Judge.

This matter comes before the Court on the parties' cross-motions for summary judgment. Plaintiffs pro se, Gregory Alan Hann and Barbara Childs Hann, seek a refund of income tax paid for the 2011 tax year. Plaintiffs seek to recharacterize as an ordinary expense the Underwriters' commission paid by Mr. Hann in connection with his participation in his employer's initial public offering. As a matter of law, the Underwriters' commission in this case is properly characterized as a capital expense because it was paid to sell a capital asset - - the stock acquired by Mr. Hann in exercising his stock options to participate in the initial public offering.

As there is no genuine dispute of material fact, summary judgment is granted in favor of Defendant.

## Background[1]

During the relevant tax years, Mr. Hann was Executive Vice President and Chief Financial Officer ("CFO") of Wesco Aircraft ("Wesco"). On January 29, 2009, while still a privately held company whose shares were not sold on an established securities market, Wesco granted Mr. Hann 65,574 stock options as compensation.[2] Each option represented the right to acquire one share of Wesco common stock ("option shares"). The initial exercise price was $64.96 per share. On October 28, 2009, some 10 months after the options were granted, the stock option agreement was amended, and the exercise price decreased to $56.64 per share. When Wesco granted the options, there were no restrictions on their exercise beyond the vesting schedule.[3] Once the options vested, Mr. Hann had full legal rights to exercise the options and acquire the stock.

On June 7, 2011, Wesco's Executive Vice President and Chief Legal Officer, John Holland, issued a confidential memorandum to Wesco employees regarding the proposed Initial Public Offering (IPO) Wesco was arranging on behalf of its primary shareholders, the Carlyle Group and Wesco's Chief Executive Office ("CEO"), Randy Snyder. Joint Ex. 4. The Holland memorandum informed employee equity holders, including Mr. Hann, that Wesco would provide them "an opportunity to sell a portion of their eligible shares in the proposed offering alongside" the primary shareholders. Id. However, participating employee equity holders were required to sell the same proportion of their shares as the primary shareholders. Id. Therefore, participation required option holders to "authoriz[e] the sale of [their] eligible shares and the automatic exercise of [their] vested and exercisable stock options . . ." to comply with the proportionality requirement. Id.

Because of a lock-up agreement,[4] the IPO was the only opportunity for employee equity holders to sell any Wesco shares without waiting until 180 days after the IPO. Id. The Holland memorandum made explicit that the employee equity holders' participation in the IPO was

---

[1]      This background is derived from the parties' stipulation of facts and exhibits and the exhibits attached to Defendant's motion for summary judgment.

[2]      The Wesco Holdings, Inc. Equity Incentive Plan Stock Option Agreement Grant Notice granted Mr. Hann both nonqualified stock options (i.e. ordinary options) and incentive stock options. See Jt. Ex. 14. Mr. Hann exercised his nonqualified stock options in the transaction. Jt. Ex. 9.

[3]      Of the 65,574 options granted to Mr. Hann, 16,393 options vested on a time-based schedule (i.e. after Mr. Hann worked for a specified period), with one-third of the options vesting annually on September 30 of 2009, 2010 and 2011. Jt. Ex. 14. The remaining 49,181 options vested on a performance-based schedule. Id.

[4]      Lock-up agreements bar existing shareholders from selling additional shares for a defined period after the IPO. Lock-up agreements are "common, even essential, to the typical IPO" because they assure potential buyers of the IPO's securities, that additional shares owned by the "pre-IPO shareholders of the issuer will not enter the public market too soon after the offering." Lowinger v. Morgan Stanley & Co. LLC, 841 F.3d 122, 131 (2d Cir. 2016)(internal citations and quotation marks omitted). "These assurances lead investors reasonably to expect an orderly market free of the danger of large sales of pre-owned shares depressing the share price before the pricing of the newly offered shares has settled in the market." Id.

"optional and voluntary." Id. Mr. Hann was aware that his participation in the IPO was optional and that he could still exercise his options after the expiration of the 180-day "lock-up period."

As Wesco's Chief Financial Officer, Mr. Hann was significantly involved in the IPO process. Hann Dep.; Tr. 25. Wesco issued and filed with the Securities and Exchange Commission the Prospectus for the proposed IPO on July 27, 2011. In the Prospectus, Wesco represented that the selling shareholders were offering 21,000,000 shares of Wesco common stock in this offering and that Wesco would not receive any proceeds from the sale of the shares held by the selling stockholders. Def.'s Ex. 4. Wesco also represented:

- the public offering of the price of the stock would be $15 per share;

- the underwriting discounts and commissions would be $0.8625 per share; and

- the proceeds to the selling shareholders would be $14.1375 per share.

Id. Wesco "agreed to pay expenses incurred by the selling stockholders in connection with the offering, other than the underwriting discounts and commission." Id.

Mr. Hann elected to participate in the IPO. Wesco arranged for a "cashless exercise," whereby participating option holders did not pay the exercise price out of pocket. Rather, "the exercise price was deducted from the compensation the participant received from the Underwriters. Holland 30(b)(6) Dep. 16.[5] To achieve this cashless exercise and participate in the IPO, Mr. Hann executed four documents prior to the July 28, 2011 IPO - - a Power of Attorney, an Exercise Notice, a Custody Agreement, and a Lock-Up Agreement.

The Power of Attorney authorized Mr. Hann (acting as a Wesco executive, not in an individual capacity) and a second Wesco executive (the "Attorneys") to sell to the Underwriters up to the "Maximum Number of Optional Shares . . . represented by the Book-Entry credits placed in escrow or the Exercise Notices deposited by [Mr. Hann] with the Custodian pursuant to the Custody Agreement . . . at a purchase price per share to be paid by the Underwriters, as determined by negotiation . . . " between Wesco and the representatives of the Underwriters. Joint Ex. 10. The "Maximum Number of Optional Shares" was 39,167.63 (determined prior to a stock split), roughly 60 percent of Mr. Hann's Shares of Common Stock Subject to Option. Joint Ex. 11.

The Exercise Notice notified Wesco that Mr. Hann exercised the vested portion of his options "in connection with the Company's anticipated initial public offering . . . contingent upon the inclusion of the shares . . . in the offering contemplated . . . [in an amount to] be determined by the Attorneys . . . ."[6] Joint Ex. 9. The Exercise Notice directed that the "full amount of the exercise price necessary to exercise [Mr. Hann's] Vested Options and any applicable tax withholding obligations be deducted from the net proceeds [Mr. Hann was] entitled to receive from the

---

[5]   "Holland 30(b)(6) Dep." refers to John Holland's Rule 30(b)(6) deposition on behalf of Wesco Aircraft Holdings, Inc. rather than his individual deposition.

[6]   Mr. Hann exercised his nonqualified stock options in the transaction.

subsequent sale of such Shares to certain Underwriters, as specified in the Custody Agreement." Id.

The Custody Agreement directed that the IPO Custodian retain "Exercise Notices" delivered by Mr. Hann and required Mr. Hann to concurrently execute an irrevocable power of attorney authorizing the Attorneys to sell up to the number of shares of common stock represented by his Exercise Notices and to enter an underwriting agreement in order to sell the shares on Mr. Hann's behalf. Joint Ex. 11. Upon the closing date specified in the Underwriting Agreement, the Custody Agreement directed the Custodian to (i) exercise the number of options subject to the Exercise Notices to the extent necessary to provide the "Maximum Number of Shares" (i.e. the number of shares necessary to meet the proportionality requirement) to the Underwriters, (ii) transfer the option stock to the Underwriters, (iii) receive payment for the option stock from the Underwriters, (iv) pay the exercise price from the amount received from the Underwriters, (v) remit the balance to Mr. Hann, and (vi) furnish Mr. Hann a Form 1099 reflecting the transaction by January 31 of the following tax year. Id.

The "Lock-Up Agreement" restricted Wesco equity holders, like Mr. Hann, from (1) offering, pledging, selling, contracting to sell, selling an option or contract to purchase, purchasing an option or contract to sell, granting any option, right or warrant to purchase, lending, or otherwise transferring or disposing of, directly or indirectly, any common stock they beneficially owned, or (2) entering into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock for 180 days after the IPO. Joint Ex. 8.

The "cashless exercise" described by Mr. Holland took place in several distinct steps. First, the primary shareholders, in conjunction with the Underwriters, determined the proportion of their interest in Wesco they would sell and those shares' market price. Immediately prior to the IPO, Wesco undertook a nine-way stock split. Joint Stip. ¶ 10. Each share was priced by the Underwriters for public purchase at $15 per share. Id. at ¶ 9. Corresponding with the stock split, Mr. Hann's options increased ninefold, from 65,574 to 356,558 options, and his option exercise price was reduced to one-ninth the existing price, from $56.64 per share to $6.29333 per share. Id. at ¶¶ 4-5, 8, 10.

On July 28, 2011, immediately prior to the IPO, the participating shareholders, including Mr. Hann, sold their shares to the lead Underwriters, Barclays Capital Inc. and Morgan Stanley & Co., LLC (the "Underwriters") for $14.1375 per share (a discount to their $15 fair market value). Id. at ¶¶ 11, 14. Pursuant to the Custody Agreement, Mr. Hann's Attorneys exercised 89,139 options on Mr. Hann's behalf and immediately sold these 89,139 shares to the Underwriters, who paid Mr. Hann $14.1375 per share. Id. at ¶ 18; Joint Ex. 5. The Underwriters then sold these shares to the public at $15 per share, taking a "commission" of $0.8625 per share (the "Underwriters' commission"). Joint Stip. ¶¶ 14; Def.'s Ex. 4 ("The underwriting fee is the difference between the initial price to the public and the amount the underwriters pay to the selling stockholders for the shares."). Mr. Hann did not take physical custody of any shares pursuant to his participation in the IPO. Joint Stip. ¶ 14. However, as Mr. Holland acknowledged, to participate in the IPO Mr. Hann needed to exercise his options and receive shares. Holland Dep. 19, 30.

All of the selling shareholders received from the Underwriters the net proceeds (the gross, fair market price less the Underwriters' commission) for their shares. Joint Stip. ¶ 14. For the sale

of Mr. Hann's 89,139 shares at $15 per share, the gross proceeds were $1,337,085. The Underwriters' commission of $0.8625 per share for 89,139 shares amounted to $76,882.39. Id. at ¶ 20. Therefore, the net proceeds from Mr. Hann's sale of stock to the Underwriters, $1,260,202, was deposited into Mr. Hann's Morgan Stanley Smith Barney account. Joint Exs. 5, 6.

Wesco issued Mr. Hann a W-2 for the 2011 tax year reporting ordinary income from the IPO of $776,103.56. Joint Ex. 7. This amount corresponds to the gross proceeds received in the IPO, $1,337,085, less the option exercise price, $560,981.44. On April 15, 2012, Plaintiffs filed a year 2011 tax return treating the $776,103.56 reported on the W-2 as ordinary income and the $76,882.39 Underwriters' commission as a short-term capital loss. Joint Ex. 1.

On April 19, 2012, Plaintiffs filed an amended individual income tax return (Form 1040-X) for tax year 2011, reporting the Underwriters' commission as a reduction of gross income, and requesting a $26,908 refund. Joint Ex. 2. Plaintiffs provided an explanation, stating:

> In June 2011, Wesco Aircraft had an initial public offering. As part of this transaction, taxpayer exercised certain nonqualified stock options. The difference between the stock's fair market value at time of exercise and the option price was included in taxpayer's W-2 income. However, taxpayer was required to pay the Underwriters' commission as part of this overall transaction. This $76,882 of commission paid by the taxpayer is in fact part of his required cost to exercise the option through the public offering. As such, this amount should reduce taxpayer's W-2 income as reflected in this tax return.

Joint Ex. 2. On June 10, 2014, the Internal Revenue Service ("IRS") disallowed Plaintiffs' refund claim for tax year 2011. Joint Stip. ¶ 23. Plaintiffs filed the instant action on January 8, 2015. This Court held oral argument on the cross-motions for summary judgment on April 10, 2017, and the parties filed supplemental briefs on May 10, 2017 and May 22, 2017.

## Discussion

### Jurisdiction

The United States Court of Federal Claims is authorized to adjudicate tax refund claims under the Tucker Act. 28 U.S.C. § 1491(a)(1) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department . . . in cases not sounding in tort."). Section 7422 of the Internal Revenue Code governs the procedural requirements for such cases. Wolens v. United States, 125 Fed. Cl. 422, 426 (2016). "Taxpayers must first pay the assessed tax in full and file a tax refund claim with the IRS before bringing suit in federal court." Id. (citing 26 U.S.C. § 7422(a)). "If the refund claim is denied, the taxpayer generally must file suit within two years, and then may only raise the claims and arguments previously presented to the IRS." Id. (internal citations omitted).

Here, the Plaintiffs fully paid the income tax for 2011, properly filed a refund claim with the IRS, and timely filed a suit in this Court.

**Legal Standard for Summary Judgment**

In granting a motion for summary judgment, a court must find that there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A genuine dispute is one which "may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit . . . ." Id. at 248. The moving party bears the burden of establishing the absence of any genuine issue of material fact. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Once the burden is met, the onus shifts to the non-movant to point to sufficient evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. Liberty Lobby, 477 U.S. 256-57. When considering a motion for summary judgment, the court draws all factual inferences in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When opposing parties both move for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Mingus, 812 F.2d at 1391. At the summary judgment phase, the court may not weigh any evidence but only "determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249.

**The Underwriters' Commission Is Properly Characterized as a Capital Loss**

The parties stipulated to all material facts. At issue is the proper tax treatment of the Underwriters' commission. Plaintiffs argue that the Underwriters' commission was properly deductible from their 2011 ordinary income, entitling them to the $20,116 refund claimed on their amended return.[7] J. Ex. 2. They posit four alternative theories. First, Plaintiffs argue the transaction, in which Mr. Hann exercised his options and received cash, was a single-step transaction. Pls.' Mot. 2-3. Second, Plaintiffs argue that Mr. Hann paid the Underwriters' commission in order to exercise the options, entitling them to reduce the amount realized under either 26 U.S.C. § 83 or 26 U.S.C. § 1012. Compl. ¶¶ 6-7, 12-13, 15; Pls.' Mot. 3-4. Third, Plaintiffs argue the Underwriters' commission was an ordinary and necessary expenditure incurred in a trade or business, deductible from gross income under 26 U.S.C. § 162. Compl. ¶ 8, 14; Pls.' Mot. Fourth, Plaintiffs make a "substance over form" argument, asserting that because they paid the Underwriters' commission to generate ordinary income, the expense should be deductible from ordinary income, and the form of the transaction should be disregarded. Pls.' Mot. 5. Defendant argues that the Underwriters' commission was a cost incurred to sell the stock acquired by exercising the options on the public market and is properly characterized as a capital loss under 26 U.S.C. § 1011. Def.'s Mot. 1-2.

Mr. Hann realized ordinary income upon receiving the options and was required to recognize as ordinary income the fair market value of the option shares received less the exercise price paid. In a separate taxable step, to participate in the IPO, Mr. Hann sold that stock to the Underwriters, paid the Underwriters' commission, and received the fair market value of his shares. The Underwriters' commission is properly treated as a reduction in the amount realized on Mr. Hann's sale of the stock to the Underwriters. Because the Underwriters' commission reduced the

---

[7]     In their complaint, Plaintiffs seek $26,908.

sale price to an amount below Mr. Hann's basis in his shares, the difference is properly characterized as a capital loss, which cannot offset ordinary income beyond $3,000 annually. 26 U.S.C. § 1211(b)(1) (2016).

## Step (1): Mr. Hann Received Ordinary Income When He Exercised His Options

An employee who receives nonqualified stock options as compensation for services performed realizes ordinary income. 26 U.S.C. § 83(a) (2016); see also Comm'r v. LoBue, 351 U.S. 243, 247 (1956) ("When assets are transferred by an employer to an employee to secure better services they are plainly compensation. It makes no difference that the compensation is paid in stock [options] rather than in money."). However, if the options lack a readily ascertainable fair market value at grant, the employee does not immediately recognize income. 26 U.S.C. § 83(e)(3). Instead, the employee recognizes income upon exercising the option. 26 C.F.R. § 1.83-7(a).

When an employee exercises nonqualified stock options, the employee must include in his gross income the difference between the option stock's fair market value at exercise and the "amount paid" to acquire the option stock. 26 U.S.C. § 83(a)(1). "[T]he term 'amount paid' refers to any amount paid for the grant of the option plus any amount paid as the exercise price of the option." 26 C.F.R. § 1.83-3(g) (2014).

As part of his 2009 employee compensation, Mr. Hann received nonqualified stock options. Mr. Hann did not pay any additional amount for the grant of the option. When Wesco granted Mr. Hann these stock options, it was a privately held corporation, and its stock was not sold on an established market, and had no "readily ascertainable fair market value." 26 C.F.R. § 1.83-7(b)(2). As the options lacked a readily ascertainable fair market value at grant, they were not taxable upon receipt. 26 U.S.C. § 83(e)(3). Plaintiffs were therefore not required to recognize as income the fair market value of the stock options Mr. Hann received as compensation in 2009. Instead, Plaintiffs deferred income recognition until Mr. Hann exercised the options. 26 C.F.R. § 1.83-7(a).

To participate in the IPO, Mr. Hann placed an Irrevocable Exercise Notice in escrow and authorized his Attorneys to exercise his options as required by the Underwriting Agreement. Mr. Hann's Attorneys exercised 89,139 options on his behalf, pursuant to the proportionality requirement determined by the primary shareholders upon finalizing the IPO. As a result, the Attorneys received from Wesco 89,139 shares on Mr. Hann's behalf that they immediately resold to the Underwriters. Mr. Hann was the beneficial owner of these 89,139 shares the Attorneys received. Therefore, at the time of exercise, Plaintiffs were required to recognize as ordinary income the difference between the option stock's fair market value at exercise and the amount paid to acquire the option stock. 26 C.F.R. § 1.83-7(a); 26 U.S.C. § 83(a).

On the exercise date, the 89,139 Wesco shares' fair market value was $15 per share,[8] or $1,337,085 total. The amount paid to acquire the option stock was the $6.29333 per share,[9] or $560,981.14 total. 26 C.F.R. § 1.83-3(g). Therefore, Plaintiffs were required to recognize as ordinary income $8.70667 per share ($15 less $6.29333), or $776,103.88 total -- the amount reported by Wesco on Mr. Hann's 2011 W-2. Joint Ex. 7. This was the first taxable step in Mr. Hann's IPO participation.

## Step (2): Mr. Hann Generated a Capital Loss By Selling His Wesco Shares to the Underwriters

The tax consequences of a capital asset transaction govern the second taxable step in Mr. Hann's IPO participation. A capital asset is any property not enumerated in 26 U.S.C. § 1221(a).[10] Stock in a corporation is a capital asset as it is not so enumerated. 26 U.S.C. § 1221(a) (2016); see also Ark. Best Corp. v. Comm'r, 485 U.S. 212, 217-18 (1988).

Unless otherwise provided in the Internal Revenue Code, a taxpayer recognizes all gain or loss upon the disposition of property. 26 U.S.C. § 1001(c) (2016). The taxpayer must include in gross income all gain recognized from the disposition of property. Id. § 61(a)(3) (2016). Individual taxpayers may deduct from gross income any loss recognized in a transaction entered into for profit. Id. at § 165(a)-(c) (2016). However, individual taxpayers may generally only deduct a capital loss from gross income to the extent of capital gain recognized in that tax year. Id. at §§ 165(f), 1211(b). When capital losses exceed capital gains in a given year, an individual taxpayer may further deduct a maximum of $3,000 in that tax year. Id. at 1211(b)(1). Any remaining capital loss converts into capital loss carryover and carryback, which can offset capital gain in past and future tax years. See id. at §§ 172 and 1212(b).

---

[8]     The Underwriters determined this fair market price of the Wesco shares in the simultaneously occurring IPO.

[9]     Per 26 C.F.R. § 1.83-3(g), this "amount paid" represents the $6.29333 per share exercise price plus $0 paid for the option grant. However, Mr. Hann did not pay the exercise price out of pocket, the Underwriters paid it to Wesco on his behalf from Mr. Hann's proceeds from the IPO.

[10]    Enumerated non-capital property includes (1) stock in trade properly included in the taxpayer's inventory or held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business and accounts or notes receivable acquired from the sale thereof; (2) trade or business property depreciable by the taxpayer under 26 U.S.C. § 167 and real property used by the taxpayer in a trade or business; (3) copyrights, literary, musical, or artistic compositions, letters or memoranda, or similar property held by certain taxpayers; (4) accounts or notes receivable acquired for services rendered in the ordinary course of trade or business; (5) U.S. Government publications received from the government by certain taxpayers at a price other than that offered to the public; (6) any commodities derivative financial instrument that fails to meet certain requirements and is held by a commodities derivatives dealer; (7) certain hedging transactions; and (8) supplies of a type regularly used or consumed by the taxpayer in the ordinary course of the taxpayer's trade or business. 26 U.S.C. § 1221(a) (2016).

Mr. Hann acquired 89,139 Wesco shares when his Attorneys implemented the Exercise Notice and Custody Agreement, pursuant to the Underwriting Agreement. Mr. Hann is not in the trade or business of selling securities, and Mr. Hann's Wesco option shares were a capital asset. 26 U.S.C. § 1221(a). Contemporaneously with exercising Mr. Hann's options – but in a separate, taxable step – the Attorneys sold Mr. Hann's 89,139 Wesco shares to the Underwriters on Mr. Hann's behalf. Upon the disposition of Mr. Hann's shares to the Underwriters, Plaintiffs realized a capital loss to the extent their basis in the Wesco shares exceeded the amount realized on the sale. Id. at § 1001(a).

On the sale, Plaintiffs realized $15 per share in the fair market value of the option stock paid by the Underwriters. However, because Mr. Hann paid the Underwriters' commission as a cost of participating in the IPO and selling his Wesco shares, Plaintiffs must reduce the amount realized by the $0.8625 per share for the Underwriters' commission, to a net amount realized of $14.1375 per share, or $1,260,202.61. The Underwriters' commission was incurred by all IPO participants to sell the Wesco stock to the Underwriters, and was a capital expense. Davis v. Comm'r, 151 F.2d 441, 443 (8th Cir. 1945), cert. denied, 327 U.S. 783 (1946) (Underwriters' commissions paid by a principal shareholder pursuant to an IPO are a capital expense paid to sell the stock). "It has long been recognized, as a general matter, that costs incurred in the acquisition or disposition of a capital asset are to be treated as capital expenditures." Woodward v. Comm'r, 397 U.S. 572, 575 (1970). As Plaintiffs' basis in the shares exceeded the amount realized on the sale to the Underwriters by $0.8625 per share, Plaintiffs realized a capital loss of $76,882.39, the amount of the Underwriters' commission. 26 U.S.C. §§ 165, 1001. However, because Plaintiffs lacked other capital gains in 2011, they were permitted to recognize (i.e. deduct) a maximum of $3,000 as a capital loss. Id. at § 1211(b)(1).

**The Two Steps' Simultaneous Execution Does Not Affect Their Separate Tax Treatment**

Plaintiffs argue Mr. Hann engaged in a single-step transaction whereby he exercised his options and received cash proceeds. Plaintiffs argue that Mr. Hann never took possession of any stock and his "participation [in the IPO] as a non-qualified option holder did not allow him to receive common st[o]ck upon exercise of the options." Pls.' Mot. 1. Therefore, in Plaintiffs' view, the Underwriters' commission should offset Plaintiffs' ordinary income.

While Mr. Hann's participation in the IPO did not entitle him to retain common stock upon exercising his options, in order to participate in the IPO, Mr. Hann needed to acquire Wesco shares via his options and then immediately resell the shares to the Underwriters. Holland Dep. 12-13, 15-17. Mr. Hann held legal – if not physical – ownership of the shares when his Attorneys exercised the options on his behalf. Id. at 19, 29-30. Only after Mr. Hann gained legal ownership of the shares could his Attorneys sell those shares to the IPO Underwriters. The short duration of Mr. Hann's legal ownership of the Wesco shares did not alter the tax consequences of his ownership and sale of the stock. The acquisition of Wesco stock pursuant to his stock options followed by the immediate resale of the Wesco stock to the Underwriters was necessarily a two-step transaction. That Wesco agreed to accept payment of the exercise price directly from the Underwriters does not change the taxable steps taken by Mr. Hann.

**The Underwriters' Commission Is Not Governed By § 83 or § 1012**

Plaintiffs argue that because Mr. Hann could not have exercised the options without paying the Underwriters' commission, the commission could either be an "amount paid" to exercise the options under 26 U.S.C. § 83 or be capitalized in the stock's basis under 26 U.S.C. § 1012. Under either scenario, in Plaintiffs' view, the Underwriters' commission should reduce the ordinary income realized from the option exercise, rather than the capital income realized on the subsequent sale of the option stock to the Underwriters.

Plaintiffs' theory fails because payment of the Underwriters' commission was not required for Mr. Hann to exercise his options, but was compensation to the Underwriters for valuing and establishing a public market for Wesco stock for the IPO. Contrary to Plaintiffs' assertions, Mr. Hann could have exercised the options without paying the Underwriters' commission, as restricted by the lock-up agreement. IPO participation was separate and distinct from Mr. Hann's ability to exercise his options. Rather than effect a cashless exercise, Mr. Hann was entitled to exercise the options, pay the exercise price, and retain ownership of the option shares in Wesco. See Wesco Dep. at 22; Holland Dep. 15. Mr. Hann could have waited until the expiration of the lock-up period to sell his Wesco shares so acquired. Joint Stip. 15. Paying the Underwriters' commission was only a condition precedent to Mr. Hann's participating in the IPO, it was not a condition precedent to his exercising the options.

Accordingly, Plaintiffs must treat the Underwriters' commission as a capital expense paid to sell the stock and reduce the amount realized on the sale. Spreckles v. Comm'r, 315 U.S. 626, 630 (1942).

**The Underwriters' Commission Is Not a Business Expense**

Plaintiffs argue the Underwriters' commission is an ordinary and necessary expenditure incurred in a trade or business, and therefore deductible from gross income under 26 U.S.C. § 162 and 26 C.F.R. § 1.162-1. Section 162(a) permits the deduction of all ordinary and necessary expenses paid in carrying on a trade or business. Plaintiffs claim Mr. Hann's trade or business was being "an executive of Wesco Aircraft" and that the Underwriters' commission was "an ordinary and necessary business expense directly connected with the exercise of the option and the related generation of ordinary income." Pls.' Mot. 4.

Mr. Hann was Wesco's Chief Financial Officer; his trade or business was being a Wesco employee. An individual may be in the trade or business of being an employee. 26 C.F.R. § 1.162-17(a); Mitchell v. United States, 408 F.2d 435, 439 (Ct. Cl. 1969) ("[B]eing a corporate official . . . constitutes the 'carrying on' of a trade or business within the meaning of section 162(a)."). Exercising his options made Mr. Hann a shareholder in Wesco – separate from his status as an employee. When he immediately sold his shareholder interest in Wesco to the IPO Underwriters, he sold a capital interest in the corporation.

An individual who is both an employee and shareholder must acknowledge that dual status and separately determine the tax consequences of each activity. See United States v. Generes, 405 U.S. 93, 100 (1972) (a "taxpayer's dual status relative to the corporation . . . [as] both a shareholder and an employee . . . occasion different tax consequences."). Expenses associated with one's trade or business as a corporate executive are deductible as a trade or business expense. But expenses incurred in one's capacity as a shareholder, where profit comes from appreciation in the value of

business and distributed earnings, must be allocated to one's capital interest in the corporation. As the Tax Court, citing <u>Spreckles</u>, explained:

> selling commissions paid in connection with the disposition of securities may not be deducted as ordinary and necessary expenses by one not a dealer in securities, and [these] commissions are to be treated as offsets against the sale price in determining the gain or loss incident to the disposition of property.

<u>Davis v. Comm'r</u>, 4 T.C. 329, 333 (1944), <u>aff'd</u>, 151 F.2d 441 (8th Cir. 1945), <u>cert. denied</u>, 327 U.S. 783 (1946). Because Mr. Hann was not in the trade or business of selling securities, Plaintiffs cannot deduct as a trade or business expense commissions paid to sell securities.  Instead, the expenses Mr. Hann incurred selling his capital interest in Wesco may offset the amount Plaintiffs realized in the transaction. <u>Spreckles</u>, 315 U.S. at 630.

**The Substance Over Form Doctrine Is Inapplicable**

Plaintiffs make a purported "substance over form" argument, positing that the "true economics of the transaction" should be reflected in the tax result, allowing them to offset their ordinary income.  Plaintiffs argue that "[t]he income generated to the [P]laintiffs is ordinary income and there is no situation in which the exercise of these options could be treated as a capital gain[,] therefore the expenses required to generate this ordinary income should be ordinary in nature as well." Pls.' Mot. 5.  Plaintiffs' focus on the ordinary income generated by the option exercises ignores the second transaction and the economic reality that Mr. Hann sold his Wesco shares and opted to participate in the IPO.  The IPO participants including Mr. Hann paid the Underwriters' commission in order to sell their shares to the Underwriters, not in order to exercise their options.  In short, the true economics of the transaction are reflected in the tax result Plaintiffs received.

## Conclusion

Plaintiffs' motion for summary judgment is **DENIED,** and Defendant's motion for summary judgment is **GRANTED**.

_Mary Ellen Coster Williams_
MARY ELLEN COSTER WILLIAMS
Judge

11